Justice Souter,
with whom Justice Stevens, Justice Ginsburg, and Justice Breyer join, dissenting.
The significance and effect of today’s judgment, from which I respectfully dissent, turn on three things: the demand for campaign money in huge amounts from large contributors, whose power has produced a cynical electorate; the congressional recognition of the ensuing threat to democratic integrity as reflected in a century of legislation restricting the electoral leverage of concentrations of money in corporate and union treasuries; and McConnell v. Federal Election Comm’n, 540 U. S. 93 (2003), declaring the facial validity of the most recent Act of Congress in that tradition, a decision that is effectively, and unjustifiably, overruled today.[1]
I
The indispensable ingredient of a political candidacy is money for advertising. In the 2004 campaign, more than half of the combined expenditures by the two principal Presidential candidates (excluding fundraising) went for media time and space. See The Costliest Campaign, Washington Post, Dec. 30, 2004, p. A7.[2] And in the 2005-2006 election *505 cycle, the expenditure of more than $2 billion on television shattered the previous record, even without a Presidential contest. See Inside Media, MediaWeek, Nov. 20, 2006, p. 18. The portent is for still greater spending. By the end of March 2007, almost a year before the first primary and more than 18 months before the general election, Presidential can *506 didates had already raised over $150 million. See Balz, Fundraising Totals Challenge Early Campaign Assumptions, Washington Post, Apr. 17,2007, p. A1 (citing figures and noting that “[t]he campaign is living up to its reputation as the most expensive in U. S. history”). To reach this total, the leading fundraisers collected over $250,000 per day in the first quarter of 2007, Mullins, Clinton Leads the Money Race, Wall Street Journal, Apr. 16, 2007, p. A8, and the eventual nominees are expected to raise $500 million apiece (about $680,000 per day over a 2-year election cycle), Kirkpatrick & Pilhofer, McCain Lags in Income But Excels in Spending, Report Shows, N. Y. Times, Apr. 15, 2007, p. 20.
The indispensability of these huge sums has two significant consequences for American government that are particularly on point here. The enormous demands, first, assign power to deep pockets. See Balz, supra, at A6 (“For all the interest in Internet fundraising, big donors still ruled in the first quarter, with roughly 80 percent of donations coming in amounts of $1,000 or more”). Candidates occasionally boast about the number of contributors they have, but the headlines speaking in dollars reflect political reality. See, e. g., Mullins, supra, at A8 (headlined “Clinton Leads the Money Race”).
Some major contributors get satisfaction from pitching in for their candidates, but political preference fails to account for the frequency of giving “substantial sums to both major national parties,” McConnell, supra, at 148, a practice driven “by stark political pragmatism, not by ideological support for either party or their candidates,” Brief for Committee for Economic Development et al. as Amici Curiae in McConnell, O. T. 2003, No. 02-1674, p. 3 (hereinafter CED Brief). What the high-dollar pragmatists of either variety get is special access to the officials they help elect, and with it a disproportionate influence on those in power. See McConnell, supra, at 130-131. As the erstwhile officer of a large American corporation put it, “‘[bjusiness leaders believe — based on *507 experience and with good reason — that... access gives them an opportunity to shape and affect governmental decisions and that their ability to do so derives from the fact that they have given large sums of money to the parties.’” CED Brief 9. At a critical level, contributions that underwrite elections are leverage for enormous political influence.
Voters know this. Hence, the second important consequence of the demand for big money to finance publicity: pervasive public cynicism. A 2002 poll found that 71 percent of Americans think Members of Congress cast votes based on the views of their big contributors, even when those views differ from the Member’s own beliefs about what is best for the country. Mellman & Wirthlin 267; see also id., at 266 (“In public opinion research it is uncommon to have 70 percent or more of the public see an issue the same way. When they do, it indicates an unusually strong agreement on that issue”). The same percentage believes that the will of contributors tempts Members to vote against the majority view of their constituents. Id., at 267. Almost half of Americans believe that Members often decide how to vote based on what big contributors to their party want, while only a quarter think Members often base their votes on perceptions of what is best for the country or their constituents. Ibid.
Devoting concentrations of money in self-interested hands to the support of political campaigning therefore threatens the capacity of this democracy to represent its constituents and the confidence of its citizens in their capacity to govern themselves. These are the elements summed up in the notion of political integrity, giving it a value second to none in a free society.
II
If the threat to this value flowing from concentrations of money in politics has reached an unprecedented enormity, it has been gathering force for generations. Before the turn of the last century, as now, it was obvious that the purchase of influence and the cynicism of voters threaten the integrity *508 and stability of democratic government, each derived from the responsiveness of its law to the interests of citizens and their confidence in that focus. The danger has traditionally seemed at its apex when no reasonable limits constrain the campaign activities of organizations whose “unique legal and economic characteristics” are tailored to “facilitat[e] the amassing of large treasuries,” Austin v. Michigan Chamber of Commerce, 494 U. S. 652, 658, 660 (1990). Corporations were the earliest subjects of concern; the same characteristics that have made them engines of the Nation’s extraordinary prosperity have given them the financial muscle to gain “advantage in the political marketplace” when they turn from core corporate activity to electioneering, Federal Election Comm’n v. Massachusetts Citizens for Life, Inc., 479 U. S. 238, 257-258 (1986) (MCFL), and in “Congress’ judgment” the same concern extends to labor unions as to corporations, Federal Election Comm’n v. National Right to Work Comm., 459 U. S. 197, 210 (1982); see also Austin, supra, at 661.
A
In the wake of the industrial expansion after the Civil War there developed a momentum for civic reform that led to the enactment of the Pendleton Civil Service Act of 1883, ch. 27, 22 Stat. 403, which stopped political parties from raising money through compulsory assessments on federal employees. Not unnaturally, corporations filled the vacuum, see R. Mutch, Campaigns, Congress, and Courts xvi-xvii (1988) (hereinafter Mutch), and in due course demonstrated what concentrated capital could do. The resulting political leverage disturbed “the confidence of the plain people of small means in our political institutions,” E. Root, The Political Use of Money (delivered Sept. 3,1894), in Addresses on Government and Citizenship 141, 143-144 (R. Bacon & J. Scott eds. 1916) (cited in United States v. Automobile Workers, 352 U. S. 567, 571 (1957)), and the 1904 Presidential campaign *509 eventually “crystallized popular sentiment” on the subject of money and politics, id., at 572. In his next message to Congress, President Theodore Roosevelt invoked the power “to protect the integrity of the elections of its own officials [as] inherent” in government, and called for “vigorous measures to eradicate” perceived political corruption, for he found “no enemy of free government more dangerous and none so insidious.”[3] 39 Cong. Rec. 17 (1904).
The following year, the President urged that “[a]ll contributions by corporations to any political committee or for any political purpose should be forbidden by law.” 40 Cong. Rec. 96 (1905). His call was seconded by the Senate sponsor of the eventual legislation, whose “sad thought [was] that the Senate is discredited by the people of the United States as being a body more or less corruptible or corrupted.” Id., at 229. The President persisted in his 1906 message to Congress with another call for “a law prohibiting all corporations from contributing to the campaign expenses of any party,” 41 Cong. Rec. 22, and the next year Congress passed the Tillman Act of 1907:
“it shall be unlawful for any national bank, or any corporation organized by authority of any laws of Congress, to make a money contribution in connection with any election to any political office. It shall also be unlawful for any corporation whatever to make a money contribution in connection with any election at which Presidential and Vice-Presidential electors or a Representative in Congress is to be voted for or any election by any *510 State legislature of a United States Senator.” Ch. 420, 34 Stat. 864-865.[4]
The aim was “not merely to prevent the subversion of the integrity of the electoral process,” but “to sustain the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government.” Automobile Workers, supra, at 575.
B
Thirty years later, new questions about the electoral influence of accumulated wealth surfaced as organized labor expanded during the New Deal. In the 1936 election, labor unions contributed “unprecedented” sums, S. Rep. No. 151, 75th Cong., 1st Sess., 127 (1937), the greater part of them by the United Mine Workers, see Campaign Finance Source-book 17. And in due course reaction began to build: “[w]artime strikes gave rise to fears of the new concentration of power represented by the gains of trade unionism. And so the belief grew that, just as the great corporations had made huge political contributions to influence governmental action . . . , the powerful unions were pursuing a similar course, and with the same untoward consequences for the democratic process.” Automobile Workers, supra, at 578. Congress responded with the War Labor Disputes Act of 1943, which extended the ban on corporate donations to labor organizations, ch. 144, § 9,57 Stat. 167-168, an extension that was made permanent in the Labor Management Relations Act, 1947, better known as Taft-Hartley, §304, 61 Stat. 159-160.
*511 c
At the same time, Congress had another worry that foreshadows our cases today. It was concerned that the statutory prohibition on corporate “contribution[s]’’ was being so narrowly construed as to open a “loophole whereby corporations, national banks, and labor organizations are enabled to avoid the obviously intended restrictive policy of the statute by garbing their financial assistance in the form of an ‘expenditure’ rather than a contribution.” S. Rep. No. 1, 80th Cong., 1st Sess., 38-39 (1947); see also H. R. Rep. No. 2739, 79th Cong., 2d Sess., 40 (1947) (“The intent and purpose of the provision of the act prohibiting any corporation or labor organization making any contribution in connection with any election would be wholly defeated if it were assumed that the term ‘making any contribution’ related only to the donating of money directly to a candidate, and excluded the vast expenditures of money in the activities herein shown to be engaged in extensively. Of what avail would a law be to prohibit the contributing direct to a candidate and yet permit the expenditure of large sums in his behalf?”). Taft-Hartley therefore extended the prohibition to any “contribution or expenditure” by a corporation or a union “in connection with” a federal election. § 304, 61 Stat. 159.[5]
D
The new law left open, however, the right of a union to spend money on electioneering from a segregated fund raised specifically for that purpose from members, but not drawn from the general treasury. Segregated funding enti *512 ties, the now-familiar political action committees, or PACs, had been established prior to Taft-Hartley, and we concluded in Pipefitters v. United States, 407 U. S. 385, 409 (1972), that Taft-Hartley did not prohibit “union contributions and expenditures from political funds financed in some sense by the voluntary donations of employees.”
This balance of authorized and restricted financing methods for corporate and union electioneering was made explicit in the Federal Election Campaign Act of 1971 (FECA). See §205,86 Stat. 10 (“[T]he phrase ‘contribution or expenditure’ . . . shall not include . . . the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation or labor organization”). “[T]he underlying theory [of the statute was] that substantial general purpose treasuries should not be diverted to political purposes, both because of the effect on the political process of such aggregated wealth and out of concern for the dissenting member or stockholder.” 117 Cong. Rec. 43381 (1971) (statement of Rep. Hansen). But the PAC exception maintained “‘the proper balance in regulating corporate and union political activity required by sound policy and the Constitution.’ ” Pipefitters, supra, at 431 (quoting 117 Cong. Rec. 43381 (statement of Rep. Hansen)).[6]
*513 E
In 1986, in MCFL, we reexamined the longstanding ban on spending corporate and union treasury funds “in connection with” federal elections, 2 U. S. C. §441b, and drew two conclusions implicated in the present cases. First, we construed the “in connection with” phrase in much the same way we had interpreted comparable FECA language challenged in Buckley v. Valeo, 424 U. S. 1 (1976) (per curiam). We held that to avoid vagueness, the product of prohibited corporate and union expenditures “must constitute ‘express advocacy* in order to be subject to the prohibition.” MCFL, 479 U. S., at 249.
We thus held that the prohibition applied “only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office.” Buckley, 424 U. S., at 44. “[E]xpress terms,” in turn, meant what had already become known as “magic words,” such as “ ‘yote for,’ ‘elect,’ ‘support,’ ‘cast your ballot for,’ ‘Smith for Congress,’ ‘vote against,’ ‘defeat,’ ‘reject.’” Id., at 44, n. 52. The consequence of this construction was obvious: it pulled the teeth out of the statute, as we had understood when we announced it in its earlier application in Buckley:
“The exacting interpretation of the statutory language necessary to avoid unconstitutional vagueness... undermines the limitation’s effectiveness as a loophole-closing provision by facilitating circumvention by those seeking to exert improper influence upon a candidate or officeholder. It would naively underestimate the ingenuity and resourcefulness of persons and groups desiring to buy influence to believe that they would have much difficulty devising expenditures that skirted the restriction on express advocacy of election or defeat but nevertheless benefited the candidate’s campaign.” Id., at 45.
Nor was the statute, even as thus narrowed, enforceable against the particular advocacy corporation challenging the *514 limit in MCFL. This was the second holding of MCFL relevant here; we explained that the congressional effort to limit the political influence of corporate money “has reflected concern not about use of the corporate form per se, but about the potential for unfair deployment of wealth for political purposes,” 479 U. S., at 259. We held that this “legitimate]” concern could not reasonably extend to electioneering expenditures by the corporation at issue in MCFL, which neither “engage[d] in business activities” nor accepted donations from business corporations and unions (and thus could not serve as a “condui[t]” for political spending by those entities). Id., at 263-264.[7]
*515 F
As was expectable, narrowing the corporate-union electioneering limitation to magic words soon reduced it to futility. “[Pjolitical money... is a moving target,” Issacharoff & Karlan, The Hydraulics of Campaign Finance Reform, 77 Texas L. Rev. 1705, 1707 (1999), and the “ingenuity and resourcefulness” of political financiers revealed the massive regulatory gap left by the “magic words” test, Buckley, supra, at 45. It proved to be the door through which so-called “issue ads” of current practice entered American politics..
An issue ad is an advertisement on a political subject urging the reader or listener to let a politician know what he thinks, but containing no magic words telling the recipient to vote for or against anyone. By the 1996 election cycle, between $135 and $150 million was being devoted to these ads, see McConnell, 540 U. S., at 127, n. 20, and because they had no magic words, they failed to trigger the limitation on union or corporate expenditures for electioneering. Experience showed, however, just what we foresaw in Buckley, that the line between “issue” broadcasts and outright electioneering was a patent fiction, as in the example of a television “issue ad” that ran during a Montana congressional race between Republican Rick Hill and Democrat Bill Yellowtail in 1996:
*516 ““‘Who is Bill Yellowtail? He preaches family values but took a swing at his wife. And Yellowtail’s response? He only slapped her. But ‘her nose was not broken.’ He talks law and order . . . but is himself a convicted felon. And though he talks about protecting children, Yellowtail failed to make his own child support payments — then voted against child support enforcement. Call Bill Yellowtail. Tell him to support family values.’”” McConnell, supra, at 193-194, n. 78.[8]
There are no “magic words” of “express advocacy” in that statement, but no one could deny with a straight face that the message called for defeating Yellowtail.
There was nothing unusual about the Yellowtail issue ad in 1996, and an enquiry into campaign practices by the Senate Committee on Governmental Affairs found as a general matter that “the distinction between issue and express advocacy . . . appeared to be meaningless in the 1996 elections.” S. Rep. No. 105-167, p. 3994 (1998). “‘“What separates issue advocacy and political advocacy is a line in the sand drawn on a windy day.” ’ ” McConnell, supra, at 126, n. 16[9] (quoting the former director of an advocacy organization’s PAC). Indeed, the president of the AFL-CIO stated that *517 “‘the bulk of’” its ads were targeted for broadcast in districts represented by “‘first-term, freshmen Republicans who . . . may be defeatable,’ ” S. Rep. No. 105-167, at 3997, 3998, and n. 23, and the Senate Committee found that the union used a “$.15 per member, per month assessment” to finance “issue ads that were clearly designed to influence the outcome of the election,” id., at 3999, 4000. Not surprisingly, “ostensibly independent” ads “were often actually coordinated with, and controlled by, the campaigns.” McConnell, supra, at 131.
Nor was it surprising that the Senate Committee heard testimony that “‘[without taming’” the vast sums flowing into issue ads, “‘campaign finance reform — no matter how thoroughly it addresses . . . perceived problems — will come to naught.’” S. Rep. No. 105-167, at 4480 (quoting testimony of Professor Daniel R. Ortiz). The Committee predicted that “if the course of non-action is followed, . . . Congress would be encouraging further growth of union, corporate nonprofit and individual independent expenditures.” Id., at 4481.[10] The next two elections validated the *518 prediction: during the 1998 cycle, spending on issue ads doubled to between $270 and $340 million, and the figure climbed to $500 million in the 2000 cycle. McConnell, 540 U. S., at 127, n. 20. A report from the Annenberg Public Policy Center concluded that “[t]he type of issue ad that dominated depended greatly on how close we were to the general election. . . . Though candidate-centered issue ads always made up a majority of issue ads, as the election approached the percent [of] candidate-centered spots increased ... such that by the last two months before the election almost all televised issue spots made a case for or against a candidate.” Issue Advertising in the 1999-2000 Election Cycle 14 (2001).
They were worth the money of those , who ultimately paid for them. According to one former Senator, “ ‘Members will . . . be favorably disposed to those who finance’” interest groups that run “ ‘issue ads’ ” when those financiers “ ‘later seek access to discuss pending legislation.’” McConnell v. Federal Election Comm'n, 251 F. Supp. 2d 176, 556 (DC 2003) (Kollar-Kotelly, J.) (quoting the declaration of Dale Bumpers).
*519 The congressional response was §203 of the Bipartisan Campaign Reform Act of 2002 (BCRA), 116 Stat. 91, which redefined prohibited “expenditure” so as to restrict corporations and unions from funding “electioneering communication[s]” out of their general treasuries. 2 U. S. C. §441b(b)(2) (2000 ed., Supp. IV). The new phrase “electioneering communication” was narrowly defined in BCRA’s §201 as “any broadcast, cable, or satellite communication” that
“(I) refers to a clearly identified candidate for Federal office;
“(II) is made within—
“(aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or
“(bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and
“(III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.” § 434(f )(3)(A)(i).
Ill
In McConnell, we found this definition to be “easily understood and objectivje],” raising “none of the vagueness concerns that drove our analysis” of the statutory language at issue in Buckley and MCFL, 540 U. S., at 194, and we held that the resulting fine separating regulated election speech from general political discourse does not, on its face, violate the First Amendment. We rejected any suggestion “that Buckley drew a constitutionally mandated line between express advocacy [with magic words] and so-called issue advocacy [without them], and that speakers possess an inviolable First Amendment right to engage in the latter category of speech.” Id., at 190. To the contrary, we held that “our *520 decisions in Buckley and MCFL were specific to the statutory language before us; they in no way drew a constitutional boundary that forever fixed the permissible scope of provisions regulating campaign-related speech.” Id., at 192-193. “[T]he presence or absence of magic words cannot meaningfully distinguish electioneering speech,” which is prohibitable, “from a true issue ad,” we said, since ads that “esehe[w] the use of magic words ... are no less clearly intended to influence the election.” Id., at 193. We thus found “[l]ittle difference . . . between an ad that urged viewers to ‘vote against Jane Doe’ and one that condemned Jane Doe’s record on a particular issue before exhorting viewers to ‘call Jane Doe and tell her what you think.’ ” Id., at 126-127.
We understood that Congress had a compelling interest in limiting this sort of electioneering by corporations and unions, for §203. exemplified a tradition of “repeatedly sustained legislation aimed at ‘the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or. no correlation to the public’s support for the corporation’s political ideas.’ ” Id., at 205 (quoting Austin, 494 U. S., at 660). Nor did we see any plausible claim of substantial over-. breadth from incidentally prohibiting ads genuinely focused on issues rather than elections, given the limitation of “electioneering communication” by time, geographical coverage, and clear reference to candidate. “Far from establishing that BCRA’s application to pure issue ads is substantial, either in an absolute sense or relative to its application to election-related advertising, the record strongly supports the contrary conclusion.” 540 U. S., at 207. Finally, we underscored the reasonableness of the §203 line by emphasizing that it defined a category of limited, but not prohibited, corporate and union speech: “Because corporations can still fund electioneering communications with PAC money, it is ‘simply wrong’ to view [§203] as a ‘complete ban’ on expression rather than a regulation.” Id., at 204 (quoting Federal Election Comm’n v. Beaumont, 539 U. S. 146, 162 (2003)). *521 Thus “corporations and unions may finance genuine issue ads [in the runup period] by simply avoiding any specific reference to federal candidates, or in doubtful cases by paying for the ad from a segregated [PAC] fund.” 540 U. S., at 206.
We may add that a nonprofit corporation, no matter what its source of funding, is free to pelt a federal candidate like Jane Doe with criticism or shower her with praise, by name and within days of an election, if it speaks through a newspaper ad or on a Web site, rather than a “broadcast, cable, or satellite communication,” 2 U. S. C. § 434(f)(3)(A)(i) (2000 ed., Supp. IV). And a nonprofit may use its general treasury to pay for clearly “electioneering communication[s]” so long as it declines to serve as a conduit for money from business corporations and unions (and thus qualifies for the MCFL exception).[11]
* * *
In sum, Congress in 1907 prohibited corporate contributions to candidates and in 1948 applied the same ban to unions. In 1947, Congress extended the complete ban from contributions to expenditures “in connection with” an election, a phrase so vague that in 1986 we held it must be confined to instances of express advocacy using magic words. Congress determined, in 2002, that corporate and union expenditures for fake issue ads devoid of magic words should be regulated using a narrow definition of “electioneering communication” to reach only broadcast ads that were the practical equivalents of express advocacy. In 2003, this Court found the provision free from vagueness and justified by the concern that drove its enactment.
This century-long tradition of legislation and judicial precedent rests on facing undeniable facts and testifies to an *522 equally undeniable value. Campaign finance reform has been a series of reactions to documented threats to electoral integrity obvious to any voter, posed by large sums of money from corporate or union treasuries, with no redolence of “grassroots” about them. Neither Congress’s decisions nor our own have understood the corrupting influence of money in politics as being limited to outright bribery or discrete quid pro quo; campaign finance reform has instead consistently focused on the more pervasive distortion of electoral institutions by concentrated wealth, on the special access and guaranteed favor that sap the representative integrity of American government and defy public confidence in its institutions. From early in the 20th century through the decision in McConnell, we have acknowledged that the value of democratic integrity justifies a realistic response when corporations and labor organizations commit the concentrated moneys in their treasuries to electioneering.
IV
The corporate appellee in these cases, Wisconsin Right to Life (WRTL), is a nonprofit corporation funded to a significant extent by contributions from other corporations.[12] In 2004, WRTL accepted over $315,000 in corporate donations, App. 40, and of its six general fluid contributions of $50,000 or more between 2002 and 2005, three, including the largest (for $140,000), came from corporate donors, id., at 118-121.
WRTL also runs a PAC, funded by individual donations, which has been active over the years in making independent campaign expenditures, as in the previous two elections involving Senator Feingold. Id., at 15. During the 1998 campaign, for example, WRTL’s PAC spent $60,000 to oppose *523 him. Ibid. In 2004, however, despite a sharp nationwide increase in PAC receipts, WRTL focused its fundraising on its corporate treasury, not the PAC, id., at 41-43, and took in only $17,000 in PAC contributions, as against over $150,000 during 2000, id., at 41-42.
Throughout the 2004 senatorial campaign, WRTL made no secret of its views about who should win the election and explicitly tied its position to the filibuster issue. Its PAC issued at least two press releases saying that its “Top Election Priorities” were to “Re-elect George W. Bush” and “Send Feingold Packing!” Id., at 78-80, 82-84. In one of these, the Chair of WRTL’s PAC was quoted as saying, “ ‘We do not want Russ Feingold to continue to have the ability to thwart President Bush’s judicial nominees.’” Id., at 82-83. The Spring 2004 issue of the WRTL PAC’s quarterly magazine ran an article headlined “Radically Pro-Abortion Feingold Must Go!,” which reported that “Feingold has been active in his opposition to Bush’s judicial nominees” and said that “the defeat of Feingold must be uppermost in the minds of Wisconsin’s pro-life community in the 2004 elections.” Id., at 101-103.
It was under these circumstances that WRTL ran the three television and radio ads in question. The bills for them were not paid by WRTL’s PAC, but out of the general treasury with its substantial proportion of corporate contributions; in fact, corporations earmarked more than $50,000 specifically to pay for the ads, id., at 41. Each one criticized an unnamed “group of Senators” for “using the filibuster delay tactic to block federal judicial nominees from a simple ‘yes’ or ‘no’ vote,” and described the Senators’ actions as “politics at work, causing gridlock and backing up some of our courts to a state of emergency.”[13] They exhorted viewers and listeners to “[cjontaet Senators Feingold and Kohl *524 and tell them to oppose the filibuster,” but instead of providing a phone number or e-mail address, they told the audience to go to BeFair.org, a Web site set up by WRTL. A visit to this Web site would erase any doubt a listener or viewer might have as to whether Senators Feingold and Kohl were part of the “group” condemned in the ads: it displayed a document that criticized the two Senators for voting to filibuster “16 out of 16 times” and accused them of “putting politics into the court system, creating gridlock, and costing taxpayers money.” Id., at 86.
WRTL’s planned airing of the ads had no apparent relation to any Senate filibuster vote but was keyed to the timing of the senatorial election. WRTL began broadcasting the ads on July 26, 2004, four days after the Senate recessed for the summer, and although the filibuster controversy raged on through 2005, WRTL did not resume running the ads after the election. Id., at 29, 32. During the campaign period that the ads did cover, Senator Feingold’s support of the filibusters was a prominent issue. His position was well known,[14] and his Republican opponents, who vocally opposed the filibusters, made the issue a major talking point in their campaigns against him.[15]
In sum, any Wisconsin voter who paid attention would have known that Democratic Senator Feingold supported filibusters against Republican presidential judicial nominees, that the propriety of the filibusters was a major issue in the senatorial campaign, and that WRTL along with the Senator’s Republican challengers opposed his reelection because *525 of his position on filibusters. Any alert voters who heard or saw WRTL’s ads would have understood that WRTL was telling them that the Senator’s position on the filibusters should be grounds to vote against him.
Given these facts, it is beyond all reasonable debate that the ads are constitutionally subject to regulation under McConnell. There, we noted that BCRA was meant to remedy the problem of “[s]o-ealled issue ads” being used “to advocate the election or defeat of clearly identified federal candidates.” 540 U. S., at 126. We then gave a paradigmatic example of these electioneering ads subject to regulation, saying that “[l]ittle difference existed . . . between an ad that urged viewers to ‘vote against Jane Doe’ and one that condemned Jane Doe’s record on a particular issue before exhorting viewers to ‘call Jane Doe and tell her what you think.’” Id., at 126-127.
The WRTL ads were indistinguishable from the Jane Doe ad; they “condemned [Senator Feingold’s] record on a particular issue” and exhorted the public to contact him and “tell [him] what you think.”[16] And just as anyone who heard the Jane Doe ad would understand that the point was to defeat Doe, anyone who heard the Feingold ads (let alone anyone who went to the Web site they named) would know that WRTL’s message was to vote against Feingold. If it is now unconstitutional to restrict WRTL’s Feingold ads, then it follows that §203 can no longer be applied constitutionally to McConnell’s Jane Doe paradigm.
McConnell’s holding that §203 is facially constitutional is overruled. By what steps does the principal opinion reach this unacknowledged result less than four years after McConnell was decided?
*526 A
First, it lays down a new test to identify a severely limited class of ads that may constitutionally be regulated as electioneering communications, a test that is flatly contrary to McConnell. An ad is the equivalent of express advocacy and subject to regulation, the opinion says, only if it is “susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.” Ante, at 470. Since the Feingold ads could, in isolation, be read as at least including calls to communicate views on filibusters to the two Senators, those ads cannot be treated as the functional equivalent of express advocacy to elect or defeat anyone, and therefore may not constitutionally be regulated at all.
But the same could have been said of the hypothetical Jane Doe ad. Its spoken message ended with the instruction to tell Doe what the voter thinks. The same could also have been said of the actual Yellowtail ad. Yet in McConnell, we gave the Jane Doe ad as the paradigm of a broadcast message that could be constitutionally regulated as election conduct, and we explicitly described the Yellowtail ad as a “striking example” of one that was “clearly intended to influence the election,” 540 U. S., at 193, and n. 78.
The principal opinion, in other words, simply inverts what we said in McConnell. While we left open the possibility of a “genuine” or “pure” issue ad that might not be open to regulation under § 203, id., at 206-207, and n. 88, we meant that an issue ad without campaign advocacy could escape the restriction. The implication of the adjectives “genuine” ánd “pure” is unmistakable: if an ad is reasonably understood as going beyond a discussion of issues (that is, if it can be understood as electoral advocacy), then by definition it is not “genuine” or “pure.” But the principal opinion inexplicably wrings the opposite conclusion from those words: if an ad is susceptible to any “reasonable interpretation other than as an appeal to vote for or against a specific candidate,” then it must be a “pure” or “genuine” issue ad. Ante, at 470. This *527 stands McConnell on its head, and on this reasoning it is possible that even some ads with magic words could not be regulated.
B
Second, the principal opinion seems to defend this inversion of McConnell as a necessary alternative to an unadministrable subjective test for the equivalence of express (and regulable) electioneering advocacy. The principal opinion acknowledges, of course, that in McConnell we said that “[t]he justifications for the regulation of express advocacy apply equally to ads aired during [the period shortly before an election] if the ads are intended to influence the voters’ decisions and have that effect.” 540 U. S., at 206. But The Chief Justice says that statement in McConnell cannot be accepted at face value because we could not, consistent with precedent, have focused our First Amendment'enquiry on whether “the speaker actually intended to affect an election.” Ante, at 468.[17] The Chief Justice suggests it is *528 more likely that the McConnell opinion inadvertently borrowed the language of “intended .. . effectfs],” 540 U. S., at 206, from academic studies in the record of viewers’ perceptions of the ads’ purposes, ante, at 466-467.[18]
*529 If The Chief Justice were correct that McConnell made the constitutional application of §208 contingent on whether a corporation’s “motives were pure,” or its issue advocacy “subjective[ly] sincer[e],” ante, at 468 (internal quotation marks omitted), then I, too, might be inclined to reconsider McConnell's language. But McConnell did not do that. It did not purport to draw constitutional lines based on the subjective motivations of corporations (or their principals) sponsoring political ads, but merely described our test for equivalence to express advocacy as resting on the ads’ “electioneering purpose,” which will be objectively apparent from those ads’ content and context (as these cases and the examples cited in McConnell readily show). We therefore held that § 203 was not substantially overbroad because “the vast majority of ads clearly had such a purpose,” and consequently could be regulated consistent with the First Amendment. 540 U. S., at 206.
For that matter, if the studies to which The Chief Justice refers were now to inform our reading of McConnell, they would merely underscore the objective character of the proper way to determine whether §203 is constitutional as applied to a given ad. The authors of those studies did not conduct discovery of the “actua[l] intensions],” ante, at 468, behind any ads; nor, to my knowledge, were the sponsors of campaign ads summoned before researchers to explain their motivations. The studies merely confirmed that “reasonable people are . . . able to discern between ads whose primary purpose is to support a candidate and those intended to provide information about a policy issue.” J. Krasno & D. Seitz, Buying Time: Television Advertising in the 1998 Congressional Elections 9 (2000). To be clear, I am not endorsing the precise methodology of those studies (and The Chief Justice is correct that we did not do so in McConnell, ante, at 467, n. 4); the point is only that the studies relied on a “reasonable” person’s understanding of the ads’ apparent *530 purpose, and thus were no less objective than The Chief Justice’s own approach.
A similarly mistaken fear of an unadministrable and speech-chilling subjective regime seems to underlie The Chief Justice’s unwillingness to acknowledge the part that consideration of an ad’s context necessarily plays in any realistic assessment of its meaning. A reasonable Wisconsinite watching or listening to WRTL’s ads. would likely ask and answer some obvious questions about their circumstances. Is the group that sponsors these ads the same one publicly campaigning against Senator Feingold’s reelection? The Chief Justice says that this information is “beside the point,” because WRTL’s history of overt electioneering only “goes to [its] subjective intent.” Ante, at 472. Did these “issue” ads begin appearing on the air during the election season, rather than at the time the filibuster “issue” was in fact being debated in the Senate? This, too, is said to be irrelevant. Ibid. And does the Web site to which WRTL’s ads direct viewers contain material expressly advocating Senator Feingold’s defeat? This enquiry is dismissed as being “one step removed from the text of the ads themselves.” Ante, at 473. But these questions are central to the meaning of the ads, and any reasonable person would take account of circumstances in coming to understand the object of WRTL’s ad. And why not? Each of the contextual facts here can be established by an objective look at a public record; none requires a voter (or a litigant) to engage in discovery of evidence about WRTL’s operations or internal communications, and none goes to a hidden state of mind.
This refusal to see and hear what any listener to WRTL’s ads would actually consider produces a rule no different in practice from the one adopted by the District Court, which declined to look beyond the “four corners” of the ads themselves. 466 F. Supp. 2d 195, 207 (DC 2006). Although The Chief Justice ostensibly stops short of categorically fore *531 closing consideration of context, see ante, at 473-474, the application of his test here makes it difficult to see how relevant contextual evidence could ever be taken into account the way it was in McConnell,[19] and it is hard to imagine The Chief Justice would ever find an ad to be “susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate,” ante, at 470, unless it contained words of express advocacy. The Chief Justice thus effectively reinstates the same toothless “magic words” criterion of regulable electioneering that led Congress to enact BCRA in the first place.
C
Third, it may be that the principal opinion rejects McConnell on the erroneous assumption that § 203 flatly bans independent electioneering communications by a corporation. The Chief Justice argues that corporations must receive “the benefit of any doubt,” ante, at 469, whenever we undertake the task of “separating . . . political speech protected under the First Amendment from that which may be banned,” ante, at 467. But this is a fundamental misconception of the task at hand: we have already held that it is “ ‘simply wrong’ to view [§203] as a ‘complete ban’ on expression,” because PAC financing provides corporations “with a consti *532 tutionally sufficient opportunity to engage in express advocacy.”[20] McConnell, 540 U. S., at 208-204 (quoting Beaumont, 589 U. S., at 162). Thus, a successful as-applied challenger to §203 should necessarily show, at the least, that it could not constitutionally be subjected to the administrative rules that govern a PAC’s formation and operation. See id., at 163. This would be an uphill fight, after our repeated affirmations that the PAC structure does not impose excessive burdens, ibid, (citing National Right to Work Comm., 459 U. S., at 201-202), and WRTL has a particularly weak position on this point: it set up its own PAC long before the 2004 election, used it to campaign openly against Senator Feingold in the past, and could have raised noncorporate donations to it in the 2004 election cycle. Any argument that establishing and maintaining a PAC is unconstitutionally burdensome for WRTL would thus likely be futile, and certainly should not prevail on WRTL’s summary judgment motion.
For that matter, even without the PAC alternative, it would be untrue that §203 “banned” WRTL from saying anything a genuine issue ad would say, for WRTL could have availed itself of either or both of the following additional options. It is undisputed that WRTL’s ads could have been broadcast lawfully in the runup to the election (and bankrolled from WRTL’s general treasury) if Senator Feingold’s name had been omitted and the Senator not otherwise singled out. Since members of today’s majority apparently view WRTL’s broadcasts either as “genuine issue ad[s],” ante, at 470 (opinion of The Chief Justice), or as “lobby[ing] Wisconsin voters concerning the filibustering of the President’s judicial nominees,” ante, at 484 (Scalia, J., concurring in part and concurring in judgment), a claim that *533 omitting Senator Feingold’s name would “ban” WRTL’s message is specious. Yet one searches my Brothers’ opinions in vain for any persuasive reason why substituting the phrase “Contact your Senators” for the phrase “Contact Senators Feingold and Kohl” would have denied WRTL a constitutionally sufficient (and clearly lawful) alternative way to send its message. If WRTL is to be believed when it claims that the issue was the point of the ads, it would have lost nothing by referring simply to the “Senators.”
Finally, the suggestion that §203 is a ban on political speech is belied by MCFL’s safe harbor for nonprofit advocacy corporations: under that rule, WRTL would have been free to attack Senator Feingold by name at any time with ads funded from its corporate treasury, if it had not also chosen to serve as a funnel for hundreds of thousands of dollars from other corporations. Thus, what is called a “ban” on speech is a limit on the financing of electioneering broadcasts by entities that refuse to take advantage of the PAC structure but insist on acting as conduits from the campaign war chests of business corporations.
D
In sum, McConnell does not graft a subjective standard onto campaign regulation, the context of campaign advertising cannot sensibly be ignored, and §203 is not a ban on speech. What cannot be gainsaid, in any event, is that in treating these subjects as it does, the operative opinion produces the result of overruling McConnell’s holding on § 203, less than four years in the Reports. Anyone who doubts that need merely ask what the law would have been if, back in 2003, this Court had held § 203 facially unconstitutional.
BCRA’s definition of “electioneering communication,” which identifies the communications regulable under §203, includes a backup to be used if the primary definition “is held to be constitutionally insufficient by final judicial decision to support the regulation provided herein.” 2 U. S. C. *534 §434(f)(3)(A)(ii) (2000 ed., Supp. IV). If this should occur, “electioneering communication” is to be defined as
“any broadcast, cable, or satellite communication which promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate) and which also is suggestive of no plausible meaning other than an exhortation to vote for or against a specific candidate.” Ibid.
This backup sounds familiar because it is essentially identical to The Chief Justice’s test for evaluating an as-applied challenge to the original definition of “electioneering communication”: regulation is permissible only if the communication is “susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate,” ante, at 470. Thus does the principal opinion institute the very standard that would have prevailed if the Court formally overruled McConnell. There is neither a theoretical nor a practical basis to claim that McConnell’s treatment of § 203 survives.
E
The price of McConnell’s demise as authority on §203 seems to me to be a high one. The Court (and, I think, the country) loses when important precedent is overruled without good reason, and there is no justification for departing from our usual rule of stare decisis here. The same combination of alternatives that was available to corporations affected by McConnell in 2003 is available today: WRTL could have run a newspaper ad, could have paid for the broadcast ads through its PAC, could have established itself as an MCFL organization free of corporate money, and could have said “call your Senators” instead of naming Senator Feingold in its ads broadcasted just before the election. Nothing in the related law surrounding §203 has changed in any way, let alone in any way that undermines McConnell’s rationale. *535 See Planned Parenthood of Southeastern Pa. v. Casey, 505 U. S. 833, 854-855 (1992).
Nor can any serious argument be made that McConnell’s holding has been “unworkable in practice.” Allied-Signal, Inc. v. Director, Div. of Taxation, 504 U. S. 768, 783 (1992) (internal quotation marks omitted). McConnell validated a clear rule resting on mostly bright-line conditions, and there is no indication that the statute has been difficult to apply.[21] Although WRTL contends that the as-applied remedy has proven to be “inadequate” because, such challenges cannot be litigated quickly enough to avoid being mooted, Brief for Appellee 65-66, nothing prevents an advertiser from obtaining a preliminary injunction if it can qualify for one, and WRTL does not point to any evidence that district courts have been unable to rule on any such matters in a timely way.
Finally, it goes without saying that nothing has changed about the facts. In Justice Frankfurter’s words, they demonstrate a threat to “the integrity of our electoral process,” Automobile Workers, 352 U. S., at 570, which for a century now Congress has repeatedly found to be imperiled by corporate, and later union, money: witness the Tillman Act, TaftHaftley, FECA, and BCRA. See Part II, supra. McConnell was our latest decision vindicating clear and reasonable boundaries that Congress has drawn to limit “ ‘the corrosive and distorting effects of immense aggregations of wealth,’ ” 540 U. S., at 205 (quoting Austin, 494 U. S., at 660), and the *536 decision could claim the justification of ongoing fact as well as decisional history in recognizing Congress’s authority to protect the integrity of elections from the distortion of corporate and union funds.
After today, the ban on contributions by corporations and unions and the limitation on their corrosive spending when they enter the political arena are open to easy circumvention, and the possibilities for regulating corporate and union campaign money are unclear. The ban on contributions will mean nothing much, now that companies and unions can save candidates the expense of advertising directly, simply by running “issue ads” without express advocacy, or by funneling the money through an independent corporation like WRTL.
But the understanding of the voters and the Congress that this kind of corporate and union spending seriously jeopardizes the integrity of democratic government will remain. The facts are too powerful to be ignored, and further efforts at campaign finance reform will come. It is only the legal landscape that now is altered, and it may be that today’s departure from precedent will drive further reexamination of the constitutional analysis: of the distinction between contributions and expenditures, or the relation between spending and speech, which have given structure to our thinking since Buckley itself was decided.
I cannot tell what the future will force upon us, but I respectfully dissent from this judgment today.

 Substantially for the reasons stated by the Court, ante, at 461-464, I believe these cases are justiciable.

 Between candidates, political action committees, interest groups, and national, state, and local parties, spending on the 2004 state and federal elections exceeded $4 billion. K. Patterson, Spending in the 2004 Elec *505 tion, in Financing the 2004 Election 68, 71, tbl. 3-1 (D. Magleby, A. Corrado, & K. Patterson eds. 2006).' Congressional campaigns spent over $1 billion in 2004, id., at 75, tbl. 3-4, state legislative candidates raised three-quarters of a billion dollars in the 2003-2004 election cycle, The Institute on Money in State Politics, State Elections Overview 2004, p. 2 (2005), online at http://www.followthemoney.org/press/Reports/ 200601041.pdf (all Internet materials as visited June 20,2007, and available in Clerk of Court’s case file), and gubernatorial candidates raised over $200 million, id., at 6. State judicial campaigns have become flush with cash as well, with state supreme court candidates raising over $30 million in the 2005-2006 cycle. J. Sample, L. Jones, & R. Weiss, The New Politics of Judicial Elections 2006, p. 16 (J. Rutledge ed. 2007), online at http:// www.justiceatstake.org/files/NewPoliticsofiJudicialElections2006.pdf. In a single 2004 judicial election in Illinois, the candidates raised a breathtaking $9.3 million, an amount the winner called “‘obscene.’” The Justice-elect wondered, “ ‘How can people have faith in the system?’ ” Moyer & Brandenburg, Big Money and Special Interests are Warping Judicial Elections, Legal Times, Oct. 9, 2006, p. 50 (quoting Justice Lloyd Karmeier of the Illinois Supreme Court). According to polling data, the fear that people will lose trust in the system is well founded. With respect to judicial elections, a context in which the influence of campaign contributions is most troubling, a recent poll of business leaders revealed that about four in five thought that campaign contributions have at least “some influence” on judges’ decisions, while 90 percent are at least “somewhat concerned” that “[cjampaign contributions and^political pressure will make judges accountable to politicians and special interest groups instead of the law and the Constitution.” Zogby International, Attitudes and Views of American Business Leaders on State Judicial Elections and Political Contributions to Judges 4-5 (May 2007), online at http://www.ced.org/docs/report/ report_2007judicial_survey.pdf. People have similar feelings about other elected officials. See M. Mellman & R. Wirthlin, Public Views of Party Soft Money, in Inside the Campaign Finance Battle 266-269 (A. Corrado, T. Mann, & T. Potter eds. 2003) (hereinafter Mellman & Wirthlin); see also infra, at 507.

 Perhaps the President’s call was inspired by the accusations from his own 1904 Democratic opponent, Judge Alton B. Parker, that the Republican camp accepted corporate campaign contributions intended to buy influence. See A. Corrado, Money and Politics: A History of Federal Campaign Finance Law, in A. Corrado, T. Mann, D. Ortiz, & T. Potter, The New Campaign Finance Sourcebook 7,10-11 (2005) (hereinafter Campaign Finance Sourcebook).

 A bill along similar lines had been unsuccessfully introduced years earlier by Senator William Chandler, a New Hampshire Republican whom the railroad interests helped defeat in 1900. See Mutch 4-6 (discussing the unlikely alliance between Chandler, a radical Republican, and Senator Benjamin Tillman, a South Carolina Democrat who ultimately succeeded in enacting the law that carries his name).

 Taft-Hartley also specified that the prohibition extends to primary elections, 61 Stat. 159, an extension that had been thought likely to exceed the authority of Congress under Art. I, §4, of the Constitution until our decision in United States v. Classic, 313 U. S. 299, 317 (1941). See H. R. Rep. No. 2093, 78th Cong., 2d Sess., 8-9 (1945) (discussing the significance of Classic).

 FECA also validated corporate and union spending on internal communications and nonpartisan activities designed to promote voting. See §205, 86 Stat. 10 (“[T]he phrase ‘contribution or expenditure’ . . . shall not include communications by a corporation to its stockholders and their families or by a labor organization to its members and their families on any subject [or] nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and their families, or by a labor organization aimed at its members and their families”). “‘If an organization ... believes that certain candidates pose a threat to its well-being or the well-being of its members or stockholders, it should be able to get its views to those members or stockholders. . . . Both union members and stockholders have the right to expect this expert guidance.’ ” Pipefitters, 407 U. S., at 431, n. 42 (quoting 117 Cong. Rec. 43380 (statement of Rep. Hansen)).

 Cf. Austin v. Michigan Chamber of Commerce, 494 U. S. 652, 664 (1990) (First Amendment does not protect a nonprofit corporation from expenditure limits if the corporation accepts corporate and union contributions, lest corporations and unions readily “circumvent” restrictions on their own election spending “by funneling money through” nonprofits). Justice Scalia asserts that Austin “strayed far from” the principles we announced in First Nat. Bank of Boston v. Bellotti, 435 U. S. 765 (1978). Ante, at 489 (opinion concurring in part and concurring in judgment). Bellotti, however, concerned corporate spending in connection with a referendum, and we went out of our way in that case to avoid casting any doubt upon the constitutionality of limiting corporate expenditures during candidate elections. We said:
“The overriding concern behind the enactment of [the federal restrictions on corporate contributions and expenditures] was the problem of corruption of elected representatives through the creation of political debts. The importance of the governmental interest in preventing this occurrence has never been doubted. The case before us presents no comparable problem, and our consideration of a corporation’s right to speak on issues of general public interest implies no comparable right in the quite different context of participation in a political campaign for election to public office. Congress might well be able to demonstrate the existence of a danger of real or apparent corruption in independent expenditures by corporations to influence candidate elections.” 435 U. S., at 788, n. 26 (citations omitted).
Eight years before Austin, we unanimously reaffirmed that Bellotti “specifically pointed out that in elections of candidates to public office, *515 unlike in referenda on issues of general public interest, there may well be a threat of real or apparent corruption.” Federal Election Comm’n v. National Right to Work Comm., 459 U. S. 197, 210, n. 7 (1982). Then, four years later, in MCFL, we also noted that an expenditure limit offering corporations a PAC alternative is “distinguishable from the complete foreclosure of any opportunity for political speech” that we addressed in Bellotti. 479 U. S., at 259, n. 12. So Austin did not “stra[y]” from Bellotti, ante, at 489 (opinion of Scalia, J.); the reasons Bellotti was not controlling in Austin had been clearly foreshadowed in Bellotti itself and confirmed repeatedly in our decisions leading up to Austin.

 Or this example from a Texas district where Democrat Nick Lampson challenged incumbent Republican Steve Stockman, and where the AFL-CIO ran the following advertisement in September and October of 1996:
“‘[Narrator] What’s important to America’s families? [Middle-aged man] “My pension is very important because it will provide a significant amount of my income when I retire.” [Narrator] And where do the candidates stand? Congressman Steve Stockman voted to make it easier for corporations to raid employee pension funds. Nick Lampson opposes that plan. He supports new safeguards to protect employee pension funds. When it comes to your pension, there is a difference. Call and find out.’ ” McConnell v. Federal Election Comm’n, 251 F. Supp. 2d 176, 201 (DC 2003) (per curiam) (emphasis deleted; brackets in original).

 Quoting id., at 536, 537 (Kollar-Kotelly, J.) (in turn quoting T. Metaksa, Opening Remarks at the American Assn, of Political Consultants Fifth General Session on “Issue Advocacy,” Jan. 17,1997, p. 2).

 The Senate Committee was not alone in its concerns. In Wisconsin, for example, the Governor’s Blue-Ribbon Commission on Campaign Finance Reform reported:
“Especially beginning in 1996, issue advocacy during the campaign season dramatically expanded in Wisconsin.
“The Commission concludes that, in each of these cases, the expenditures were clearly campaign-oriented activities. They were quite dearly designed to influence the electoral process. They were focused either on electing or defeating a candidate. The Commission bases this conclusion on the following points:
“Although those paying for the activities claimed they were aimed solely at educating voters on the issues, they each mentioned the names of candidates for office.
“They occurred only when election races were in progress that involved a contest between an incumbent and a challenger. When the election was over, the activities ended.
*518 “The activity has occurred after legislative sessions when the issues about which advocacy was occurring were not being deliberated by the legislature.
“The activity occurred in campaign season, between the candidate’s filing for candidacy and election time. Advertisements of this sort have tended to occur at virtually no other time.
“The activity involved the electronic media, mass mailings, or centrally located telephone banks.
“The explosive growth of campaign-based advocacy, without even disclosure of its activities and funding sources) poses a grave risk to the integrity of elections. It has created a two-tiered campaign process: one, based in candidates and political parties, which is tightly regulated and controlled; the other, based in interest group activity under the guise of‘issue advocacy’ but actually quite clearly election-focused, which lies beyond accountability.” 1 Governor’s Blue-Ribbon Commission on Campaign Finance Reform, State of Wisconsin: Report of the Commission, online at http://www.lafollette.wise.edu/campaign_reform/final.htm.

 Campaign finance laws also continue to provide several specific exemptions from the general prohibition on corporate election-related spending, including communications “on any subject” with stockholders and certain personnel, as well as “nonpartisan registration and get-out-the-vote campaigns” similarly aimed at shareholders and personnel. §441b(b)(2); see also n. 6, supra.

 To the extent these facts are disputed, we must view them in the light most favorable to the Federal Election Commission and the intervenordefendants, since the District Court granted WRTL’s motion for summary judgment. See Pennsylvania State Police v. Suders, 542 U. S. 129, 134 (2004).

 These quotations are taken from the “Wedding” ad, although the relevant language in all of the ads is virtually identical. See ante, at 458-459, and nn. 2-3 (principal opinion) (internal quotation marks omitted).

 See, e. g., Hearing before the Subcommittee on the Constitution, Civil Rights and Property Rights of the Senate Committee on the Judiciary, 108th Cong., 1st Sess., 5-7 (2003) (statement of Sen. Feingold).

 See Gilbert, 3 Seeking Feingold Seat Attack Him on Judges Issue, Milwaukee Journal Sentinel, Nov. 18,2003, App. 70-76 (“In Wisconsin, the three Republicans vying to take on Senate Democrat Russ Feingold are attacking him on judges and assert the controversy resonates with voters”). •

 That the ads purported to target Senator Kohl as well as Senator Feingold is of little import; since the ads would have run during the peak of the 2004 campaign, the audience’s focus would naturally fall more heavily on Senator Feingold (who was up for reelection) rather than Senator Kohl (who was not).

 The Chief Justice says that Buckley v. Valeo, 424 U. S. 1 (1976) (per curiam), “already rejected” any test that calls for an assessment of the intent and effect of corporate electioneering. Ante, at 467. The “rejection]” to which The Chief Justice presumably refers is Buckley’s quotation of Thomas v. Collins, 323 U. S. 516 (1945), where we found impermissibly vague a statute that permitted a union leader to “‘laud unionism'” but forbade him to “imply an invitation” to join a union. Id., at 534. The problem with this predicament, we reasoned, was the lack of a clearly permissible opportunity for expression: Whether words “designed to fall short of invitation would miss that mark is a question both of intent and of effect,” and no speaker “safely could assume that anything he might say . . . would not be understood by some as an invitation.” Id., at 535. We then specified that the speaker in Thomas was left with an impermissibly limited universe of “three choices: (1) to stand on his right and speak freely; (2) to quit, refusing entirely to speak; (3) to trim, and even thus to risk the penalty.” Id., at 536.
The Chief Justice implies that considering the intent and effect of corporate advertising during as-applied challenges to §203 would put corporations in precisely the same bind; thus, he wonders how McConnell could use the language of intent and effect without “even addressing] *528 what Buckley” (and by extension, Thomas) “had to say on the subject.” Ante, at 467. But one need not look far in our McConnell opinion to understand why we thought that corporations have more than the constrained set of options available to the union leader in Thomas. Just a few sentences after holding that ads with electioneering intent and effect are regulable, we gave this explanation: “in the future corporations and unions may finance genuine issue ads [shortly before an election] by simply avoiding any specific reference to federal candidates, or in doubtful cases by paying for the ad from a segregated fund.” 540 U. S., at 206. In other words, corporations can find refuge in constitutionally sufficient and clearly delineated safe harbors by modifying the content of their ads (by omitting a candidate’s name) or by altering the sources of their ads’ financing (from general treasuries to PACs). The Chief Justice thus wrongly jettisons our conclusions about the constitutionality of regulating ads with electioneering purpose; we meant what we said in McConnell, and we did not overlook First Amendment jurisprudence when we said it. Whereas The Chief Justice says that BCRA “should provide a safe harbor for those who wish to exercise First Amendment rights,” ante, at 467, we already held in McConnell that the campaign finance law accomplishes precisely that.

 The Chief Justice speculates that McConnell derived its test for functional equivalence from “[t]wo key studies,” ante, at 466, but not a shred of language in McConnell supports that theory. In stating the legal standard, McConnell made no mention of any study. What is.the authority, then, for asserting that the studies were pivotal to the standard we announced in McConnell? See ante, at 466. Other than WRTL’s brief, The Chief Justice cites only Judge Henderson’s separate District Court opinion in McConnell. Ante, at 466. But The Chief Justice quotes one part of Judge Henderson’s analysis and neglects to mention that she in turn was quoting the lead author of one of the studies in question: “According to the Brennan Center, the Buying Time reports were ‘the central piece of evidence marshaled by defenders of’ BCRA’s electioneering communication provisions ‘in support of their constitutional validity.’” McConnell, 251 F. Supp. 2d, at 307-308 (quoting deposition of Craig B. Holman, principal co-author of Buying Time 2000: Television Advertising in the 2000 Federal Elections (Brennan Center 2001); italics in original; brackets omitted).

 Like the District Court, the only bit of context The Chief Justice would allow the reasonable listener is the congressional agenda: whether the “‘issue’” addressed in an ad currently is, or soon will be, “‘the subject of legislative scrutiny.’” Ante, at 474 (quoting 466 F. Supp. 2d, at 207). For example, The Chief Justice says, there would have been “no reason” to think that WRTL’s ad constituted anything but a pure issue ad if it addressed a bill pending during Senator Feingold’s reelection campaign, such as the Universal National Service Act. Ante, at 470. It is revealing, of course, that The Chief Justice does not invoke the filibuster issue, the subject of WRTL’s ads, as the legislative matter with particular salience during the 2004 election. But why the reasonable listener can look to Congress but not the calendar on the wall or a WRTL Web site is difficult to fathom.

 Justice Scalia also adopts the same misconception that §203 is a “ban” on speech. See ante, at 499 (“Section 203’s line is bright, but it bans vast amounts of political advocacy indistinguishable from hitherto protected speech”).

 These as-applied challenges provide no reason to second-guess our conclusion in McConnell that the rule for differentiating between electioneering ads and genuine issue ads is administrable. WRTL’s ads clearly have an electioneering purpose and, as explained above, fall comfortably within the heartland of electioneering communications that §203 may validly regulate. Thus, although Justice Scalia claims that “[tloday’s cases make it apparent” that McConnell must be overruled, ante, at 500, there is nothing about today’s cases that suggests that McConnell is unworkable. We therefore have no occasion to reconsider McConnell from first principles.